

# Pharmacy Services Agreement

THIS AGREEMENT (this "Agreement") is made by and between AlignRx, LLC ("ALIGN"), a Delaware limited liability company, and, a pharmacy licensed and authorized to provide pharmacy services in each state in which it conducts business (hereinafter referred to as "Pharmacy") at the locations listed on Exhibit A of this Agreement. ALIGN and Pharmacy may be referred to individually in this Agreement as a "Party" and collectively as "Parties".

**WHEREAS**, ALIGN shall provide certain Pharmacy Services Administrative Organization ("PSAO") Services to Pharmacy or to contracted Payors on behalf of Pharmacy. PSAO Services may be provided by ALIGN regardless of whether ALIGN directly contracts with Payors or Pharmacy contracts with Payors; and

**WHEREAS**, both Parties agree to comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") as well as the Health Information Technology for Economic and Clinical Health act ("HITECH"), including the Privacy, Security, Breach Notification and Enforcement Rules in 45 C.F.R. parts 160 and 164 and their accompanying regulations ("HIPAA Rules"); and

**WHEREAS**, ALIGN is a Business Associate as that term is defined by HIPAA the parties shall execute a business associate agreement.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained and other good and valuable consideration, it is mutually agreed by and between the Parties hereto as follows:

## 1. DEFINITIONS

1.1 "Covered Persons" shall mean those employees or members and their dependents who have elected to receive prescription drugs from Network Providers and who are covered by a benefit plan insured, provided, or administered by a Payor.

1.2 "Covered Pharmacy Services" shall mean all pharmacy services, drugs, and supplies, that Pharmacy is authorized to provide under applicable law, and that are rendered to a Covered Person by Pharmacy for which Payor is obligated to pay or reimburse pursuant to a benefit plan insured, provided, or administered by a Payor.

1.3 "Payor" shall mean any private or governmental entity or company including, but not limited to, employers, union groups, associations, insurers, health maintenance organizations, pharmacy benefit managers, pharmacy benefit administrators, or third party administrators, that has contracted with Pharmacy and/or ALIGN for the provision of Covered Pharmacy Services.

1.4 "Payor Agreement" means an agreement between ALIGN and a Payor or Pharmacy and a Payor whereby the Payor agrees to offer to Covered Persons one or more Payor Plans and ALIGN or Pharmacy agrees to arrange for the provision of Covered Pharmacy Services specified in such plans.

1.5 "Payor Plan" shall mean all programs established by Payor involving Network Providers.

1.6 "Provider Manual" shall mean a manual prepared and amended by Payor(s) which contains Payor(s) policies and procedures, as amended from time to time in accordance with Payor Agreement or other applicable contracts. Provider Manual(s) may be provided in the form of a web-based internet site.

## 2. ALIGN SERVICES

2.1 **Pharmacy Services Administrative Organization ("PSAO Services").** ALIGN shall provide certain services (the "PSAO Services") to Pharmacy based upon Pharmacy's execution of one or more Addendums to this Agreement. The terms of this Agreement, any regulatory amendment, and any executed Addendum shall apply. PSAO Services are described in each Addendum.

2.2 **Pharmacist-Patient Relationship.** ALIGN agrees that it shall not interfere with the right of Pharmacy to exercise professional judgment in the rendition of services, it being understood and agreed that the traditional relationship between the pharmacist and patient will be maintained.

## 3. CONFIDENTIALITY AND NONDISCLOSURE OF DATA

3.1 **Non-Disclosure of Data.** Protected Health Information, as defined by HIPAA Rules, and any other data obtained from Pharmacy by ALIGN are collectively referred to as "Data" in this Agreement. ALIGN agrees to keep all Data confidential under the terms of this Agreement and applicable law. ALIGN agrees to not use or disclose Data other than as permitted or required by this Agreement or in the case of Data that is Protected Health Information, it will be additionally maintained as required by law.

3.2 **HIPAA Compliance.** ALIGN and Pharmacy shall execute a business associate agreement in the form of Addendum E of this Agreement.

3.3 **ALIGN's Use of Data.** Upon execution of this Agreement and any addenda, Pharmacy shall provide the necessary Data that ALIGN needs to perform PSAO Services for which the parties have contracted.

3.4 **Minimum Data Necessary.** ALIGN agrees that it shall only access, use, and disclose the minimum amount of Data as may be reasonably necessary to fulfill ALIGN's obligations under the terms of this Agreement and any executed Addendum. ALIGN may use or disclose Data to perform functions, activities or services for, or on behalf of, Pharmacy as specified in this Agreement and any executed Addendum. ALIGN may use or disclose Data to the extent required by law or government agency.

ALIGN may use Data for the proper management and administration of PSAO Services to Pharmacy or to perform its contractual responsibilities to the Pharmacy.

3.5 **Limitation of Data Use.** Pharmacy shall notify ALIGN of any confidentiality obligations, limitations or requirements pertaining to Data pursuant to any contracts, agreements or participation requirements involving Pharmacy.

3.6 **Third Party Nondisclosure Requirement.** Pharmacy shall notify ALIGN of any contractual requirement for ALIGN to enter into a nondisclosure agreement with any third party with whom Pharmacy does business and will work with the third party and ALIGN to obtain a nondisclosure agreement that is satisfactory to all parties.

## 4. PHARMACY OBLIGATIONS

4.1 **Appointment of ALIGN.** Pharmacy hereby appoints ALIGN as its agent and authorized representative pursuant to the rendering of PSAO Services selected by Pharmacy pursuant to this Agreement and Addendum.

4.2 **Changes in Pharmacy Information.** Pharmacy shall notify ALIGN in writing, at least thirty (30) calendar days prior to any change in Pharmacy's name, business address, business telephone number, office hours, ownership, corporate structure, type of pharmacy business (ie., retail, specialty, compounding, mail order, long term care), licensure, tax identification number, malpractice insurance carrier or coverage limits, or services provided by Pharmacy.

4.3 **Data Collection and Reporting.** Pharmacy acknowledges certain PSAO Services are based on actual claims and cost data. Pharmacy agrees to provide or arrange to provide data to ALIGN. Pharmacy may use ALIGN's claim processing services or arrange data feeds from Pharmacy's claim processor or software vendor. Pharmacy agrees that any Data collected under this Agreement shall be available to ALIGN for use in delivering PSAO Services under this Agreement and Addendum.

4.4 **Nondisclosure.** Pharmacy shall not disclose the terms of this Agreement or any Addendum or any Payor Agreement, including but not limited to any fee schedule, without the prior written consent of ALIGN. This paragraph shall survive the termination of this Agreement and Addendum.

4.5 **Subrogation.** If required by law, Pharmacy shall make any determination of subrogation rights or seek out other reimbursement benefits that may be payable other than payments received under this Agreement and Addendum.

4.6 **Pharmacy Services.** Pharmacy shall not refuse to provide services to any Covered Person on the basis of race, color, religion, sex, age, national origin, or Payor Plan.

4.7 **Recordkeeping.** Pharmacy agrees to maintain such records as are necessary to comply with the requirements of any rules and regulations of any appropriate governmental agency for a period of at least ten (10) years following termination of this Agreement. In accordance with requirements of the Omnibus Budget Reconciliation Act of 1980, until the expiration of four (4) years after the furnishing of services pursuant to

this Agreement, Pharmacy shall make available, upon request, to the Secretary of Health and Human Services or the Comptroller General, or to any other of their duly authorized representatives, this Agreement, books, documents and records of Pharmacy that are necessary to certify the extent of any cost arising from this Agreement.

4.8 **Taxes.** The burden of taxes or fees assessed by state or local governments on transactions between ALIGN and Pharmacy shall be borne by Pharmacy.

## 5. INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between ALIGN and Pharmacy other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement. Neither of the Parties, nor any of their respective officers, directors or employees, shall be construed to be the authorized representative, employee or representative of the other except as specifically described in Section 4.1. Neither Party is authorized to represent the other for any purpose whatsoever without the prior consent of the other.

## 6. INDEMNIFICATION AND LIMITATION ON DAMAGES

**6.1 Indemnification.** Pharmacy shall defend, indemnify, protect and hold harmless ALIGN and each of its affiliates, subsidiaries, officers, directors, employees, representatives and agents (the "Indemnified Parties") for, from and against any and all claims, demands, actions, causes of action, suits, proceedings, hearings or investigations, and losses, liabilities, injuries, damages, costs and expenses incurred by any Indemnified Party to the extent caused by, arising out of, resulting from, attributable to or in any way incidental to the occurrence of any one or more of the following: (i) Pharmacy's breach of this Agreement, (ii) any inaccuracy in any of Pharmacy's representations and warranties contained herein; and (iii) Pharmacy's failure to fully comply with all applicable Federal and State Laws or licensure requirements, and (iv) Pharmacy's negligence, willful misconduct, errors or omissions, or commission of fraud, waste or abuse. This obligation shall survive expiration or termination of this Agreement.

**6.2 Limitation on Damages.** Pharmacy acknowledges and agrees that in no event shall ALIGN, any affiliate or subsidiary, or any of its officers, directors, employees, subcontractors, representatives or agents be liable to Pharmacy for any special, indirect, incidental, or consequential, punitive or exemplary damages, loss of profits, or loss of goodwill, even if such damages occur. Pharmacy agrees that the sole and exclusive remedy available to Pharmacy shall be limited to the recovery of actual damages not in excess of the total member fees actually paid to ALIGN, reduced by any amounts paid, credited or refunded to Pharmacy by ALIGN, plus any central pay reimbursement allocable to Pharmacy that has been received by ALIGN but not disbursed to Pharmacy. To the extent ALIGN makes arrangements with certain third-parties to offer goods or services to Pharmacy, Pharmacy agrees and hereby does waive all claims for loss,

damage, liability, injury, cost or expenses incurred or alleged to have been incurred by Pharmacy or its affiliates or their respective employees, representatives and agents against ALIGN and its affiliates and their respective employees, representatives and agents as a result of having purchased or used such goods and services, including all claims of failure of such goods and services. The Parties agree that this limitation of liability shall survive and continue in full force and effect despite any failure of an exclusive remedy. Such limitation of liability shall survive expiration or termination of this Agreement.

## 7. TERM AND TERMINATION

7.1    **Termination Date.** This Agreement shall have an initial term which shall expire one (1) year from the signature date herein below indicated (the "Termination Date"). Unless terminated in accordance with Section 7.2 or 7.3, this Agreement shall automatically renew for successive terms of one (1) year each.

7.2    **Termination by Notice.** Either Party may terminate this Agreement or any Addendum attached hereto, with or without cause, by giving the other Party thirty (30) days written notice.

7.3    **Termination by ALIGN.** ALIGN may, at its sole option, terminate this Agreement or any Addendum attached hereto effective upon notice to Pharmacy upon any of the following conditions: (i) Pharmacy makes an assignment for the benefit of creditors, is the subject of a voluntary or involuntary petition for bankruptcy or is adjudged to be insolvent or bankrupt, or a receive or trustee is appointed for any reason; (ii) receipt by ALIGN of a notice from Pharmacy as required by Section 7.2; (iii) ALIGN becomes aware that Pharmacy has made a misrepresentation with respect to this Agreement or has failed to comply with any terms in this Agreement; (iv) the occurrence of one of the events about which Pharmacy should give notice pursuant to this Agreement and has failed to do so; (v) ALIGN reasonably believes Pharmacy has been or is engaged in fraudulent activity; (vi) ALIGN reasonably believes that Pharmacy is participating in a 340b program; (vii) Pharmacy fails to pay service fees or any balances due through the central pay program; or (viii) ALIGN determines that Pharmacy does not meet ALIGN's credentialing criteria, which may be amended by ALIGN from time to time.   Failure to remove Pharmacy       or terminate this Agreement in such circumstances shall not be considered a waiver of such ALIGN's right to do so in the future.

7.4    **Termination Continuation of Rights.** Notwithstanding termination of this Agreement, ALIGN and Payor shall continue to have access to the records maintained by Pharmacy in accordance with this Agreement for a period of ten (10) years from the date of the last provision of the Covered Pharmacy Services to Covered Persons to which the records refer for purposes consistent with their rights, duties and obligations under this Agreement and Payor Agreement. After the effective date of termination, this Agreement shall be deemed to remain in effect for the resolution of all matters unresolved at that date. Termination of this Agreement shall not affect the rights, obligations and liabilities of the parties arising out of the transactions occurring prior to termination.

7.5    **Other Remedies.** Nothing contained in this Agreement shall be construed to

limit either Party's lawful remedies in the event of a material breach of this Agreement.

7.6    **Effect of Termination.**  Upon termination of this Agreement, any Addendum is contemporaneously terminated.  Except as provided in the paragraph below, upon termination of this Agreement, for any reason, ALIGN shall, if feasible, return or destroy any Data received from Pharmacy, or created or received by ALIGN on behalf of Pharmacy. This provision shall apply to Data that is in the possession of Subcontractors or agents of ALIGN. ALIGN shall retain no copies of the Data.

In the event that ALIGN determines that returning or destroying the Data is infeasible, ALIGN shall subject the Data to the same safeguards as for an active engagement. ALIGN shall extend the protections of this Agreement to such Data and limit further uses and disclosures of such Data to those purposes that make the return or destruction infeasible, for so long as ALIGN maintains such Data.


**8.    MISCELLANEOUS**

8.1    **Modification of this Agreement.**  ALIGN may modify any provision of this Agreement and any executed Addendum upon thirty (30) days prior written notice to Pharmacy.  Pharmacy shall be deemed to have accepted ALIGN's modification if Pharmacy fails to object to such modification in writing within the thirty (30) day notice period. Pharmacy's objection to the modification will have the same effect as a thirty (30) day notice of termination of the Agreement pursuant to section 6.2..  Amendments required by legislative, regulatory or other legal authority as determined by ALIGN, do not require the consent of ALIGN or Pharmacy and will be effective immediately upon Pharmacy's receipt of notice of amendment.

8.2    **Assignment.**  This Agreement and any executed Addendum, being intended to secure the services of and be personal to Pharmacy, shall not be assigned, sublet, delegated or transferred by Pharmacy without the prior written consent of ALIGN. Any change in the control of Pharmacy resulting from a merger, consolidation, stock transfer, or asset sale shall be deemed an assignment or transfer for purposes of this Agreement and as such shall require the prior written consent of ALIGN. **Further, in no event shall any terminations, transfers or assignments relieve any current owner of Pharmacy of any of the obligations of the Pharmacy under this Agreement.** ALIGN may assign this Agreement and any executed Addendum (including the rights, duties and obligations of ALIGN and Pharmacy). This Agreement and any executed Addendum shall inure to the benefit of and shall bind the successors and permitted assignees of the parties hereto.


8.3    **Notice.**  Any notice required to be given pursuant to the terms and provisions hereof shall be sent by (a) hand delivery, (b) certified mail, return receipt requested, postage prepaid, (c) facsimile, or (d) email to ALIGN or to Pharmacy at the respective addresses indicated below.  Notice shall be deemed to be effective when mailed, faxed or emailed.

**If to Pharmacy:** _____

_____

_____

Attn:_____

Facsimile:_____

Email: _____

**If to ALIGN:** AlignRx, LLC.
3000 E. Memorial Rd.
Edmond, OK 73013
Attn: Melanie Maxwell, President
Email: mmaxwell@alignrx.org

8.4 **Governing Law and Venue.** This Agreement and any executed Addendum shall be governed in all respects by the laws of the State of Oklahoma to the extent not preempted by HIPAA, the HIPAA Rules or other applicable Federal law. The venue of any legal action arising from this Agreement shall be in Oklahoma County, Oklahoma, and ALIGN and Pharmacy specifically waive any right of venue that either might otherwise have.

8.5 **Severance of Invalid Provisions.** If any provision of this Agreement and any executed Addendum is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Agreement and any executed Addendum shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, and the remaining provision shall remain in full force and effect unaffected by such severance, provided that the invalid provision is not material to the overall purpose and operation of this Agreement.

8.6 **No Representations or Warranties.** Pharmacy acknowledges that neither ALIGN nor any of its affiliates nor any of their respective employees, agents or representatives has made any representations, warranties or promises as to the profit to be realized by Pharmacy from this Agreement, nor does ALIGN make any such representations, warranties or promises, and Pharmacy acknowledges that the profits to be realized from Pharmacy's business are dependent on many factors, most of which are in the sole control of Pharmacy.

8.7 **No Third Party Beneficiaries.** Nothing in this Agreement, express or implied, is intended to or shall confer upon any person, other than the Parties and their respective successors and permitted assigns, any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

8.8 **Incorporation by Reference**. All Exhibits and executed Addendums attached hereto are hereby incorporated into this Agreement by this reference. In the event of conflict between this Agreement and any Exhibit or Addendum, the terms of such Exhibit or Addendum shall control.

8.9    **Data Requests**. If ALIGN receives a court order, subpoena, governmental request, audit request, or custom reports related to Pharmacy's Data ("Data Request"), ALIGN may comply with such Data Request and Pharmacy shall reimburse ALIGN for and indemnify and hold ALIGN harmless from and against, any and all costs (including reasonable attorney fees), fees, losses, damages, or other expenses incurred in connection with responding to such Data Request.

8.10    **Waiver.** The waiver by either Party of any breach of any provision of this Agreement and any executed Addendum shall not be construed as a waiver of any subsequent breach of the same or any other provision. The failure to exercise any right hereunder shall not operate as a waiver of such right. All rights and remedies provided herein are cumulative.

8.11    **Entire Agreement.** This Agreement and any Addendum, executed by the Parties contain all the terms and conditions agreed upon by the Parties regarding the subject matter of this Agreement or an Addendum. Any prior agreements, promises, negotiations or representations, either oral or written, relating to the subject matter of this Agreement not expressly set forth in this Agreement are not of force or effect.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their authorized representatives as of the executed dates written below.

PHARMACY                                    **AlignRx, LLC.**

By:                                         By:

Name:                                       Name: Melanie Maxwell

Title:                                      Title: President

Date:                                       Date:


Effective Date of Agreement:

**Addendum A**
**ALIGN Provider Network Services**

**WHEREAS**, ALIGN and Pharmacy entered into a Pharmacy Services Agreement (hereafter referred to as "this Agreement") pursuant to which ALIGN agreed to furnish certain PSAO Services to Pharmacy;

**WHEREAS**, ALIGN desires to create networks of providers who shall agree to comply with participation standards established by ALIGN or contracted Payors as may be amended from time to time;

**WHEREAS,** Pharmacy is duly authorized to provide pharmacy services and desires to participate in the provider network established by ALIGN; and

**WHEREAS,** Pharmacy desires to enter into an exclusive agreement with ALIGN to participate in the provider network established by ALIGN to render Covered Pharmacy Services and to participate in Central Payment Services as set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained and other good and valuable consideration, it is mutually agreed by and between the Parties hereto as follows:

**1. DEFINITIONS IN ADDITION TO DEFINITIONS IN AGREEMENT**

1.1 "835 Data" shall mean claims payment data provided by Payor(s) in the current industry standard which details claim transactions including but not limited to prescription number, fill date, pharmacy, and amount paid.

1.2 "Central Payment Services" shall mean aggregated payments received by ALIGN to be appropriately distributed to all Network Providers. Payor(s) may or may not elect to participate in the central payment program.

1.4 "Network Participation Standards" shall mean the applicable terms of this Addendum A and the applicable terms of Payor Agreements and Provider Manuals.

1.5 "Network Provider(s)" shall mean a pharmacy that has executed this Addendum A.

**2   ALIGN SERVICES**

2.1 **Central Payment Services.**  ALIGN shall provide Central Payment Services to Pharmacy subject to the terms and conditions outlined in the ALIGN Pharmacy Services Agreement, this Addendum A, and the Payor Agreements executed on behalf of Network Providers.  For all payments made pursuant to the Central Pay Services, ALIGN shall 1) on behalf of applicable Pharmacies , receive funds from applicable Payor(s) and shall distribute funds to Network Provider according to the corresponding 835 data received from Payor(s)..  Payor(s) may elect to pay Pharmacy directly or to pay ALIGN on behalf of Pharmacy for Covered Pharmacy Services rendered.  ALIGN shall use best efforts to pay Pharmacy funds paid by Payor to ALIGN timely.  In no event shall ALIGN be obligated to pay Pharmacy for any services rendered by Pharmacy

if ALIGN has not received monies from Payor sufficient to pay for such services. In the event that a Payor withholds payments due Network Provider, a Payor advises ALIGN of its intent to withhold Network Provider payments, a Payor recoups payments previously made to Network Provider through the Central Pay Services, or ALIGN determines, at its sole discretion, such withholding or recoupment may occur, ALIGN may, at its sole discretion (a) withhold funds owed to Pharmacy, (b) debit Pharmacy's bank account for any amount due from Pharmacy or, (c) invoice Pharmacy for any amount owed by Pharmacy, which sum will be due and payable within 5 business days following the date of ALIGN's invoice. In the event of termination of this Addendum or the Agreement, ALIGN reserves the right to deduct ALIGN service fees and other charges or fees imposed under this Agreement and Addendum as applicable, that are due and payable by Pharmacy from any Payor funds due Pharmacy.

2.2 **Customer Service.** Pharmacy may utilize ALIGN's service representatives, or such other person as may be designated by ALIGN for any communication with Payor(s) and to resolve any Payor(s) issues.

2.3 **Direct Payor Agreements with Pharmacy.** In the event Pharmacy is working directly with a Payor on a direct agreement, ALIGN shall, upon Pharmacy's request, use Pharmacy's data to create a financial model projecting estimated profitability under such agreements. ALIGN shall also provide contract consulting services to Pharmacy related to such agreements, including but not limited to contract redline, profitability analysis, and negotiation strategy and tips.

2.4 **Network Marketing.** ALIGN, independently and in conjunction with or through others, intends to market to Payors a provider network, consisting of certain Network Providers.

2.5 **Other PSAO Services.** ALIGN may provide upon Pharmacy's request and with mutual agreement between ALIGN and Pharmacy certain additional administrative services related to Pharmacy's operations.

2.6 **Patient Education and Disease Management Programs.** ALIGN may establish quality programs focused on patient adherence and compliance or disease management. Certain programs may be funded by drug manufacturers in compliance with HITECH requirements. Participation in these programs shall be optional and Pharmacy shall be allowed to enroll or disenroll at the Pharmacy's discretion.

2.7 **Exclusivity and Payor Contracting.** Pharmacy agrees that ALIGN shall be the exclusive authorized contracting representative for Pharmacy. As such, ALIGN shall have the authority to negotiate and execute Payor Agreements on behalf of Pharmacy and the sole and exclusive right to bind Pharmacy to Payor Agreements and Payor Plans. Pharmacy agrees that no other representative is authorized to do so, provided that Pharmacy itself may directly enter into any payor agreements with any payor that has not established a Payor Plan with ALIGN or any Payor that has not executed a Payor Agreement directly with ALIGN.

2.8 **Price Discrepancy Program (MAC Appeals Process).** For Network Providers who supply claims data to ALIGN, ALIGN shall identify generic claims that pay below average acquisition cost and shall provide claims detail to Payors to appeal reimbursement.

2.9 **Utilization Review and Quality Assurance.** ALIGN shall perform, as appropriate, Network Providers utilization review and quality assurance review, including monitoring of PBMs for compliance with PBM's contract obligations, developed, maintained, or administered by ALIGN, whether on its behalf or on behalf of any Payor.

# 3 NETWORK PROVIDER OBLIGATIONS

3.1 **Appointment of ALIGN.** Pharmacy hereby appoints ALIGN as its agent and authorized representative: (i) to negotiate and execute any and all Payor Agreements and contracts in the name of Pharmacy, in accordance with the terms of this Agreement; (ii) to collect and receive on Pharmacy's behalf, accounts receivable generated by billings and claims for reimbursement; and (iii) to take custody of, endorse in the name of Pharmacy, and deposit into ALIGN's account, any notes, checks, money orders, insurance payments and any other instruments, received in payment of such account receivables for Covered Pharmacy Services or other services provided under or in connection with Payor Agreements.

3.2 **Central Payment Services and Claims Adjustments.** Pharmacy represents and warrants that ALIGN has the requisite authority to act on Pharmacy's behalf to receive all payments made by Payor(s) for Covered Pharmacy Services performed by Pharmacy pursuant to this Agreement and Payor(s) Agreement(s). Pharmacy agrees to participate in Central Payment Services and shall provide sufficient bank account information and authority to ALIGN to process funds due Pharmacy. In the event that Pharmacy creates a negative balance, Payor begins withholding or there is an apparent risk of Payor withholding all or any portion of a Central Payment amount due to Pharmacy through Central Payment Services, Pharmacy agrees to immediately make funds available in the Pharmacy's bank account designated for Central Payment Services and allow ALIGN to recoup from Pharmacy by electronic funds transfer all monies due. ALIGN reserves the right to hold future payments made through Central Payment Services due Pharmacy in the event Pharmacy fails to immediately make funds available to cover any recoupments from Payors and ALIGN shall have the right to use such held funds to offset against any outstanding amounts owed by Pharmacy.

3.3 **Cooperation with Utilization Review, Quality Assurance, and Payor Plan and Provider Manuals.** Pharmacy agrees to comply with the terms of the Payor Plans and Provider Manuals. Pharmacy further agrees to comply with utilization review, quality assurance, peer review and other requirements and procedures established by ALIGN or Payor, including without limitation ALIGN's or Payor's compliance programs. Pharmacy understands and agrees that amounts payable to Pharmacy for Covered Pharmacy Services may be forfeited or withheld to the extent such services are not in accordance with ALIGN's operating policies or procedures or the terms of the Payor Agreements and Provider Manuals.

3.4 **Credentialing.** Pharmacy acknowledges that ALIGN, at its sole discretion, shall make a determination whether to include Pharmacy in ALIGN's Network Providers. Pharmacy agrees to comply with ALIGN's credentialing standards, which may be revised from time to time, and agrees to fully cooperate with ALIGN's credentialing program. Pharmacy shall provide all information reasonably necessary for ALIGN to verify without limitation Pharmacy and pharmacy personnel's background, licensure status, debarment and disciplinary actions, and financial history relating to Pharmacy's operations. Pharmacy shall provide ALIGN any information on its participation in any 340b plans at the time of execution of this Addendum or the time of participation in 340b plans after the execution of this Addendum.

3.5 **Licensing/OIG Exclusion.** Pharmacy represents and warrants that neither Pharmacy nor Pharmacy owner(s), pharmacists, pharmacy technicians, or any employees of Pharmacy

furnishing Covered Pharmacy Services have been (i) listed as debarred, excluded, or otherwise ineligible for participation in federal or state health care programs; (ii) convicted of a criminal felony; (iii) been subject to any sanctions, discipline or reprimand by any State pharmacy licensing board; or (iv) been subject to any sanctions, discipline or reprimand by any federal agency governing pharmacies or pharmacists. At the time of hire and monthly thereafter, Pharmacy shall verify that it and all owner(s), pharmacists, pharmacy technicians, and employees(s) are not disbarred or excluded as required by CMS. In the event that Pharmacy becomes aware of a debarment or exclusion of pharmacy, pharmacy owner(s), pharmacist, pharmacy technicians, or any employee of Pharmacy, Pharmacy shall immediately notify ALIGN in writing and shall prevent such personnel or Pharmacy from providing Covered Pharmacy Services to Covered Persons.

3.6 **Delegation of Duties.** Pharmacy shall not delegate any duties under this Agreement to any employee or authorized representative of Pharmacy whose credentials are not in compliance with the terms, representations and warranties of this Agreement and no delegation or assignment shall be permitted without ALIGN's advance written approval.

3.7 **Disciplinary Action.** Pharmacy agrees to notify ALIGN within two (2) calendar days of the occurrence of any disciplinary proceedings initiated against Pharmacy or against one of its pharmacists or pharmacy technicians. Such notice shall include copies of any complaints, petitions, lawsuits or other documents filed or prepared in connection with such proceedings.

3.8 **No Guarantee of Utilization.** Pharmacy acknowledges that ALIGN does not warrant or guarantee that Pharmacy will be utilized by a Covered Person or any number of Covered Persons within any Payor Plan.

3.9 **Level of Participation.** Pharmacy agrees to participate in Payor Plans entered into by ALIGN, and to use best efforts to promptly deliver Covered Pharmacy Services to Covered Persons during Pharmacy's normal hours of operation. Pharmacy and Pharmacy's staff and administrative personnel shall treat Covered Persons promptly, fairly and courteously. ALIGN and Pharmacy shall portray each other in a positive light to Covered Persons and the public. Pharmacy shall, consistent with the peer review, utilization review and quality assurance programs of ALIGN and the Payor and the Network Participation Standards, provide a level of service that is consistent with ALIGN's or Payor's guidelines.

3.10 **Release of Third Party Payors.** Pharmacy agrees to release any Payor who has entered into a Payor Agreement with ALIGN from any prior agreement between such Payor and Pharmacy in order to permit ALIGN to enter into such an agreement. Pharmacy agrees to execute any documents necessary to affect such a release and Pharmacy shall be bound to Payor Agreement(s) executed by ALIGN.

3.11 **Warranties.** Pharmacy warrants that: (a) Pharmacy is duly licensed and authorized to operate as a pharmacy in all states where it provides pharmacy services and shall remain so at all times during the term of this Agreement; (b) all pharmacists employed by Pharmacy are fully licensed as pharmacists in all states in which Pharmacy provides pharmacy services; and (c) Pharmacy shall cause its pharmacists to maintain licenses in good professional standing at all times during the term of this Agreement. Evidence of such licensing and/or authorization shall be submitted by Pharmacy to ALIGN upon initial enrollment as a Network Provider and as required by ALIGN for continued participation as a Network Provider. Pharmacy further warrants

and represents that the information set forth in the membership application and any credentialing or recredentialing documents submitted by Pharmacy to ALIGN is true and accurate and Pharmacy shall amend the information set forth in that application if there is any material change.

3.12 **Participation in 340b programs.** Should Pharmacy advise ALIGN of its participation in any 340b programs or should ALIGN learn of such participation, ALIGN reserves the right to limit or remove Pharmacy's participation as a Network Provider in order to respond to or comply with market conditions or Payor requirements.

3.13 **Professional Liability Insurance.** Pharmacy, at Pharmacy's sole cost and expense, shall provide and maintain such policies of comprehensive general and professional liability insurance to insure Pharmacy and Pharmacy employees against any claim or claims for damages arising by reason of personal injuries, sickness, disease, or death, advertising injury, or from injury to or destruction of tangible or intangible property, including loss of use arising therefrom, occasioned, directly or indirectly, in connection with the performance of any service by Pharmacy or any negligent act or omission. In no event shall such insurance coverage be less than $1,000,000 per occurrence and $3,000,000 in the aggregate. All policies described above shall be effective no later than the effective date of this Agreement and shall remain effective for a period of one (1) year beyond the termination or expiration of this Agreement. Pharmacy shall, upon execution of this Agreement and at such times thereafter as ALIGN may request, furnish ALIGN evidence of such insurance in the form of certificates from the insurer of such insurance. Pharmacy's insurer shall agree to notify, ALIGN in writing thirty (30) days prior to any modifications, cancellations or terminations or replacements of any such insurance coverage for any reason whatsoever. In no event shall the foregoing coverage limits affect or limit in any manner Pharmacy's liability in connection with the performance of its obligations under this Agreement.

3.14 **Subrogation.** If required by law, Pharmacy shall make any determination of subrogation rights or seek out other reimbursement benefits that may be payable other than payments received under this Agreement.

# 4 SERVICE FEES

**4.1 Service Fees:** Pharmacy authorizes ALIGN to EFT debit Pharmacy's designated bank account in the amount of **$179.00 per month per pharmacy location**. These fees cover PSAO Services defined in this Addendum except for Central Payment Services.

**4.2 Central Payment Service Fees:** Central Payment processing fees no greater than $2.00 per day's deposit will be deducted from payment distributed to Pharmacy.

# 5. MISCELLANEOUS.

**5.1 Terms Used but not Defined Herein:** Capitalized terms used but not described herein shall have the meanings set forth in the Pharmacy Services Agreement.

**IN WITNESS WHEREOF**, the Parties have caused this Addendum to be executed by their authorized representatives as of the executed dates written below.

**ALIGNRX, LLC**

BY: _____

Name:  Melanie Maxwell

Title:  President

Date: _____

**PHARMACY**

BY: _____

Name: _____

Title: _____

Date: _____

**Effective Date of Addendum:** _____

**Enrolled Chain Code**: _____




**Addendum C**

**eRecon Claim Reconciliation Service**

**WHEREAS**, Pharmacy desires to use AlignRx's eRecon Program for Claim Reconciliation Services; and

**WHEREAS**, Pharmacy acknowledges that use of the eRecon program requires Pharmacy to be enrolled in an AlignRx Chain Code (see Addendum A of this Agreement). Failure to maintain enrollment in an AlignRx Chain Code will cause this Addendum C to terminate effective the last day of Pharmacy's enrollment in an AlignRx Chain Code.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained and other good and valuable consideration, it is mutually agreed by and between the parties hereto as follows:

**1.      DEFINITIONS IN ADDITION TO DEFINITIONS IN THE AGREEMENT**

**1.1      "835 Data"** shall mean claim payment data in current industry standard format**.**

**2.      PHARMACY OBLIGATIONS**

**2.1      Provision of Claims Data. Pharmacy agrees to use AlignRx's preferred claim processing service or provide claims Data to AlignRx through an authorized claim processing service or authorized software vendor.**

2.2      **Continued Enrollment in an AlignRx Pharmacy Network.** Pharmacy agrees to participate in one of AlignRx's Pharmacy Networks as a requirement to use the eRecon Claim Reconciliation Service

2.3      **Provision of 835 Data.** Pharmacy acknowledges that AlignRx shall use 835 Data received by AlignRx from Payor(s) participating in AlignRx's central payment program. In the event Payor does not participate in AlignRx's central payment program, Pharmacy shall complete required paperwork to direct Payor to provide 835 data to AlignRx to use in reconciling claims.

2.4      **Manual Reconciliation of Claims.** In the event Payor does not provide 835 data to AlignRx, Pharmacy shall be responsible for manually reconciling claims in the online eRecon system.

**3.      ALIGNRX OBLIGATIONS.**

3.1      **Electronic Reconciliation of Claims.** AlignRx shall use reasonable efforts to post 835 Files received from Payors to the eRecon system within five (5) business days of receipt.

3.2      **Unpaid Claims Chasing.** AlignRx shall monitor Payor's payment data to ensure timely payment of claims based on Payor's average paycycle. For claims associated with Payors that provide 835 files to AlignRx, AlignRx shall contact Payor to obtain payment for claims that have not been paid within the Payor's average paycycle or after 90 days from date of service whichever is greater.  For claims associated with Payors that do not provide 835 files to AlignRx, AlignRx shall work with Pharmacy to identify missing payments.

**4.      Service Fees.** Pharmacy authorizes AlignRx to EFT debit Pharmacy's designated bank account in the amount of $159.00 per month per pharmacy location.

**IN WITNESS WHEREOF**, the parties have caused this Addendum to be executed by their authorized representatives as of the executed dates written below.

|  | **AlignRx, LLC** |
|---|---|
| By: | By: |
| Name: | Name:  Melanie Maxwell |
| Title: | Title:      President |
| Date: | Date: |

Effective Date of Addendum: _____

**Addendum E**

**Business Associate Agreement**

This Business Associate Agreement ("Agreement") is entered into effective _____ (the "Effective Date") by and between AlignRx, LLC (the "Business Associate") and _____ (the "Covered Entity").

## RECITALS

**WHEREAS**, the Covered Entity and Business Associate have entered into one or more agreements providing, among other things, that Business Associate will perform certain services on behalf of the Covered Entity (collectively, the Pharmacy "Pharmacy Services Agreement"); and

**WHEREAS**, the parties desire to enter into this Agreement in order to comply with the Administrative Simplification provisions of the regulations adopted under Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as set forth in 45 CFR Parts 160, 162 and 164 and as amended by the HITECH Act portion of the American Recovery and Reinvestment Act of 2009 (the "HIPAA Rules").

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained and other good and valuable consideration, it is mutually agreed by and between the Parties hereto as follows:

### 1. Definitions

Words and phrases used in this Agreement, including but not limited to capitalized words and phrases, which are not otherwise defined herein shall have the meanings assigned thereto in the HIPAA Rules.

### 2. Obligations and Activities of Business Associate

    a.    Business Associate agrees not to use or disclose Protected Health Information other than as permitted or required by this Agreement or as required by law. To the extent that Business Associate is to carry out one or more of Covered Entity's obligations under Subpart E of 45 CFR Part 164, Business Associate agrees to comply with all HIPAA Rules requirements that would apply to Covered Entity in the performance of those obligations.

    b.    Business Associate agrees to use appropriate safeguards and comply with Subpart C of 45 CFR Part 164 with respect to electronic Protected Health Information, to prevent use or disclosure of protected health information other than as provided for by this Agreement.

c.  Business Associate agrees to report to Covered Entity any use or disclosure of Protected Health Information not provided for by this Agreement, including any Breaches of unsecured Protected Health Information or any Security Incidents of which it becomes aware, and Business Associate further agrees that it shall make any such report within ten (10) days of Business Associate's discovery of the use, disclosure, Breach, or Security Incident, and will at that time provide written notification of the occurrence to Covered Entity. Such notification shall include, at a minimum:

    i.  the identification of each individual whose Protected Health Information is involved is reasonably believed by Business Associate to have been, accessed, acquired, used, or disclosed due to the unauthorized use, disclosure, Breach, or Security Incident;

    ii.  a brief description of the nature and circumstances of the occurrence;

    iii.  a description of the types of Protected Health Information involved;

    iv.  a brief description of the steps that Business Associate has taken and/or will take to investigate the occurrence, mitigate potential losses, and prevent the recurrence of such events in the future.

As used herein, "Unsuccessful Security Incident" means, without limitation, a ping and other broadcast attack on Business Associate's (or its subcontractor's) firewall, port scan, unsuccessful log-on attempt, denial of service attack, and any combination of the above, so long as no such incident results in unauthorized access, use or disclosure of Protected Health Information. The parties acknowledge and agree that this Section constitutes notice by Business Associate to Covered Entity of the ongoing existence and occurrence or attempts of Unsuccessful Security Incidents for which no additional notice to Covered Entity will be required.

d.  In accordance with 45 CFR 502(e)(1)(ii) and 164.308(b)(2), if applicable, Business Associate will ensure that any Subcontractor of Business Associate that creates, receives, maintains or transmits Protected Health Information on behalf of Business Associate agrees to the same restrictions, conditions and requirements that apply through this Agreement or otherwise to Business Associate with respect to such information.

e.    Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner reasonably requested by Covered Entity, to Protected Health Information maintained by Business Associate in a Designated Record Set, to Covered Entity in order for Covered Entity to meet the requirements under 45 CFR § 164.524.

f.    Business Associate agrees to make any amendment(s) to Protected Health Information contained in a Designated Record Set maintained by Business Associate, as directed or agreed to by Covered Entity in fulfillment of its obligations under 45 C.F.R. §164.526.

g.    Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR § 164.528.

h.    Business Associate agrees to provide to Covered Entity in a time and manner as may be reasonably requested by Covered Entity, information collected in accordance with Section 2(g) above, to permit Covered Entity to respond to a request by an individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR § 164.528.

i.    Business Associate agrees to make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

**3.**    **Permitted Use and Disclosure by Business Associate**

a.    Except as otherwise limited in this Agreement, Business Associate may use or disclose Protected Health Information to perform functions, activities or services for, or on behalf of, Covered Entity as specified in the Pharmacy Services Agreement, provided that such use or disclosure would not violate the HIPAA Rules if done by the Covered Entity

b.    Except as otherwise limited in this Agreement, Business Associate may use or disclose Protected Health Information to the extent required by law.

c.    Except as otherwise limited in this Agreement, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

d.    Except as otherwise limited in this Agreement, Business Associate may disclose Protected Health Information for the proper management and

administration of the Business Associate, provided that disclosures are required by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

e.  To the extent the Pharmacy Services Agreement requires Business Associate to provide Covered Entity with data aggregation services relating to Covered Entity's health care operations, Business Associate may use Protected Health Information to provide such services.

f.  Business Associate may use Protected Health Information to report violations of law to appropriate Federal and State authorities, consistent with 45 CFR 164.502(j)(1).

## 4.  Obligations of Covered Entity

a.  Covered Entity shall notify Business Associate of any limitation(s) in its notice of privacy practices of Covered Entity in accordance with 45 CFR § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of Protected Health Information.

b.  Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by individual to use or disclose Protected Health Information, to the extent that such changes may affect Business Associate's use or disclosure of Protected Health Information.

c.  Covered Entity shall notify Business Associate of any restriction to the use or disclosure of Protected Health Information that Covered Entity has agreed to in accordance with 45 CFR § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of protected health information.

## 5.  Protection of Information Exchanged in Electronic Transactions

To the extent that Business Associate performs any standard transactions for or on behalf of Covered Entity, Business Associate shall comply with each applicable requirement of 45 C.F.R. Part 162, and further shall require any Subcontractor of Business Associate to comply with the same.

## 6.  Permissible Requests by Covered Entity

Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the HIPAA Rules if done by Covered Entity.

## 7. Term

The term of this Agreement shall be effective as of the Effective Date and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the provisions of Section 9 below.

## 8. Termination for Cause

Upon Covered Entity's knowledge of a material breach of this Agreement by Business Associate, Covered Entity shall:

a. Provide an opportunity for Business Associate to cure the breach or end the violation and terminate this Agreement and the Pharmacy Services Agreement if Business Associate does not cure the breach or end the violation within the time specified by Covered Entity; or

b. Immediately terminate this Agreement and the Pharmacy Services Agreement if Business Associate has breached a material term of this Agreement and cure is not made.

## 9. Effect of Termination

a. Except as provided in subsection (b) below, upon termination of this Agreement, for any reason, Business Associate shall return or destroy any Protected Health Information received from Covered Entity or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of Subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

b. In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall subject the Protected Health Information to the same safeguards as for an active engagement. Business Associate shall extend the protections of this Agreement to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

## 10.    Regulatory References

A reference in this Agreement to a section in any statute or in the HIPAA Rules means the section as in effect or as amended.

## 11.    Automatic Amendment

This Agreement shall be deemed amended to conform to any change in the HIPAA Rules as of the effective date of the change.

## 12.    Survival

Business Associate's obligation to protect the privacy of the Protected Health Information created or received for or from the Covered Entity will be continuous and survive termination, cancellation, expiration or other conclusion of the Agreement.

## 13.    Interpretation and Conflicts

Any ambiguity in this Agreement or the Pharmacy Services Agreement shall be resolved in favor of a meaning that permits the Covered Entity and the Business Associate to comply with HIPAA and the HIPAA Rules. In the event of conflicting terms or conditions with prior agreements between the Parties, this Agreement shall supersede any such previous agreement.

## 14.    Ownership of Protected Health Information

Protected Health Information provided by the Covered Entity to the Business Associate and any Subcontractors or created or received by them on behalf of the Covered Entity under this Agreement, is the property of the Covered Entity.

## 15.    No Third Party Beneficiary

Nothing express or implied in this Agreement or the Pharmacy Services Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assignees of the parties, any rights, remedies, obligations, or liabilities whatsoever.

## 16.    Governing Law; Jurisdiction.
This Agreement shall be governed and construed in accordance with the Laws of the State of Oklahoma without giving effect to any choice or conflict of Law provision or rule (whether of the State of Oklahoma or of any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Oklahoma. Each Party consents to the jurisdiction and venue of the United States District Court for the Western District of Oklahoma or the District Court of the State of Oklahoma located in Oklahoma City, Oklahoma.

**17.    Notice**

All notices, requests, consents and other communications hereunder will be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder.

If to the Business Associate:

AlignRx, LLC
3000 E Memorial Rd
Edmond, Ok 73013
Attn:  Melanie Maxwell, President
Email:  mmaxwell@alignrx.org

If to the Covered Entity:

_____
_____
_____
Attn: _____
Email: _____


**IN WITNESS WHEREOF**, each of the undersigned has caused this Agreement be duly executed in its name and on its behalf as of the Effective Date.

**BUSINESS ASSOCIATE**                    **COVERED ENTITY**

AlignRx, LLC                              _____
By: _____            By: _____

Name:  Melanie Maxwell                    Name: _____

Title:  President                         Title: _____

**CORPORATE GUARANTY**

**THIS CORPORATE GUARANTY** (this "Guaranty") between AlignRx, LLC, a Delaware limited liability company ("ALIGN") with its principal place of business at 3000 E. Memorial Road, Edmond, OK 73013, and _____ (hereinafter "Guarantor"), shall become effective as of _____ ("Effective Date").

*RECITALS:*

A.      **WHEREAS**, ALIGN and Guarantor entered into a Pharmacy Services Agreement inclusive of any mutually executed addenda in connection therewith and entered into as of the date hereof (collectively the "<u>Pharmacy Services Agreement</u>");

B.      **WHEREAS**, to ensure that Guarantor on behalf of itself and each Individual Pharmacy listed on Exhibit A of the Pharmacy Services Agreement (each an "Individual Pharmacy") satisfies its obligations to ALIGN under the Pharmacy Services Agreement Guarantor has agreed to enter into this Guaranty; and

**NOW, THEREFORE,** in consideration of the foregoing Recitals, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      ***Guaranty.*** Guarantor irrevocably, unconditionally and absolutely guarantees to ALIGN and its permitted successors and assigns, the full and prompt payment of all amounts due to ALIGN by the Guarantor under the Pharmacy Services Agreement. The obligations guaranteed are collectively referred to herein as the "**Guaranteed Obligations.**" All payments to be made by Guarantor hereunder shall be made within ten (10) business days after demand by ALIGN without setoff, counterclaim or deduction, in immediately available funds.

2.      ***Unconditional Obligations.***

            (a)      This Guaranty is a guaranty of payment and performance and not of collection and is an absolute, unconditional and irrevocable guarantee of the full and prompt payment and performance when due of the Guaranteed Obligations, whether or not from time to time reduced or extinguished or hereafter increased or incurred, whether or not recovery may be, or hereafter may become, barred by any statute of limitations or otherwise, and whether or not enforceable against the Guarantor or any other Person (Person meaning: any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof), and despite any arrangement or composition entered into in connection with any such bankruptcy or other proceeding. Without limiting the generality of the foregoing, Guarantor acknowledges and agrees that this Guaranty shall be and will remain in full force and effect notwithstanding any bankruptcy, insolvency, termination or dissolution of the Guarantor. If any payment made by the Guarantor or any other Person or entity and applied to the Guaranteed Obligations is at any time annulled, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be repaid or refunded, then, to the extent of such payment or repayment, the liability of Guarantor shall be and will remain in full force and

effect as fully as if such payment had never been made. Guarantor covenants that its Guaranty will not be fulfilled or discharged, except by the complete payment of the Guaranteed Obligations, whether by the primary obligor or Guarantor under this Guaranty. Without limiting the generality of the foregoing, Guarantor's obligations hereunder shall not be released, discharged or otherwise affected by (i) any change in the structure or ownership of the Guarantor, including, without limitation, any transfer by Guarantor of all or any portion of its interest in the Guarantor without the express written consent of the ALIGN, any change in the Pharmacy Services Agreement or any obligations thereunder, or any insolvency, bankruptcy or similar proceeding affecting the Guarantor or their respective assets, (ii) the existence of any claim or set-off which the Guarantor has or may have against ALIGN, whether in connection with this Guaranty or any unrelated transaction; provided, however, that nothing in this Guaranty shall be deemed a waiver by Guarantor of any claim or prevent the assertion of any claim by separate suit and (iii) any change in the time, manner or terms of payment of the Guaranteed Obligations. This Guaranty shall in all respects be a continuing, absolute and unconditional Guaranty irrespective of the genuineness, validity, regularity or enforceability of the Guaranteed Obligations or any part thereof or any instrument or agreement evidencing any of the Guaranteed Obligations or relating thereto, or the existence, validity, enforceability, perfection or extent of any collateral therefor or any other circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the Guaranteed Obligations or this Guaranty. ALIGN is not obligated to file any claim relating to the Guaranteed Obligations in the event that the Guarantor or any other Person or entity associated with Guarantor becomes subject to a bankruptcy, reorganization or similar proceeding and the failure of ALIGN so to file shall not affect Guarantor's obligations under this Guaranty.

(b)     Guarantor's performance of some, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge Guarantor's liability for those Guaranteed Obligations which have not been performed.

(c)     ALIGN, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability of this Guaranty or giving rise to any reduction, limitation, impairment, discharge or termination of Guarantor's liability hereunder, from time to time may: (i) with respect to the Company's financial obligations, renew, extend, accelerate, increase the rate of interest on or otherwise change the time, place, manner or terms of payment of financial obligations that are Guaranteed Obligations, and/or subordinate the payment of the same to the payment of any other obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto; (iii) request and accept other guarantees of the Guaranteed Obligations and take and hold security for the payment of this Guaranty or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for performance of the Guaranteed Obligations, any other guarantees of the Guaranteed Obligations, or any other obligation of any Person with respect to the Guaranteed Obligations; (v) enforce and apply any security hereafter held by or for the benefit of ALIGN in respect of this Guaranty or the Guaranteed Obligations and direct the order or

manner of sale thereof, or exercise any other right or remedy that ALIGN may have against any such security, as ALIGN in its discretion may determine; and (vi) exercise any other rights available to it under the Pharmacy Services Agreement.

(d)     This Guaranty and the obligations of Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than indefeasible performance in full of the Guaranteed Obligations), including without limitation the occurrence of any of the following, whether or not Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce, or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Pharmacy Services Agreement, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement or instrument relating thereto; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any term or provision (including without limitation provisions relating to events of default) of the Pharmacy Services Agreement or any agreement or instrument executed pursuant thereto; (iii) the consent by ALIGN to the change, reorganization or termination of the corporate structure or existence of the Guarantor; (iv) any defense, set-off or counterclaim which the Guarantor may allege or assert against ALIGN in respect of any Guaranteed Obligation, including but not limited to failure of consideration, breach of warranty, statute of frauds, statute of limitations, accord and satisfaction and usury; and (v) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of Guarantor as an obligor in respect of the Guaranteed Obligations.

(e)     Any indebtedness or obligations of the Guarantor to its affiliated companies and its Individual Pharmacies, whether now or hereafter existing, shall be subordinated to the prior payment and performance in full of the Guaranteed Obligations.

3.     ***Waivers.*** To the fullest extent permitted by law, Guarantor hereby waives and agrees not to assert or take advantage of: (i) any right to require ALIGN to proceed against the Guarantor or any other Person or entity associated with Guarantor or to proceed against or exhaust any security held by ALIGN at any time or to pursue any right or remedy under the Pharmacy Services Agreement or any other remedy in ALIGN's power before proceeding against Guarantor; (ii) any defense that may arise by reason of the lack of authority or revocation hereof by Guarantor or any other Person or entity associated with Guarantor, or the failure of ALIGN to file or enforce a claim against the estate (either in administration, bankruptcy or any other proceeding) of any such Person; (iii) any defense that may arise by reason of any presentment, demand for payment or performance or otherwise, protest or notice of any other kind or lack thereof; (iv) any defense based upon an election of remedies by ALIGN which destroys or otherwise impairs the subrogation rights of Guarantor or the right of Guarantor to proceed against the Guarantor for reimbursement, indemnity, or contribution, or with respect to any other right or remedy of Guarantor; (v) all notices to Guarantor, to the Company, or to any other Person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, modification, accrual of any of the Company's obligations under the Pharmacy Services Agreement, or of default in the payment or performance of

any such obligation, enforcement of any right or remedy with respect thereto or notice of any other matter relating thereto; (f) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (vi) any requirements of diligence or promptness on the part of ALIGN; (vii) all rights, remedies, defenses, and claims and/or rights of counterclaim, recoupments, offset or setoff under applicable law including, but not limited to, all offsets, setoffs, rights, remedies or defenses which may be afforded to Guarantor by any of Title 12, Okla. Stat. (2021) § 686 and/or Title 46, Okla. Stat. (2021) § 43 and/or Title 15, Okla. Stat. (2021) §§ 334, 337, 338 and 344, as any such statutes may be amended from time to time; (viii) any rights or claims that the Guarantor may acquire against the Guarantor that arise from the performance of the Guarantor's obligations hereunder (including subrogation, reimbursement, exoneration, contribution or indemnification); and (ix) any other circumstance which might otherwise constitute a defense available to, or a discharge of the Guarantor , the Guarantor or any other guarantor with respect to the Guaranteed Obligations.

4.      ***Cumulative Rights***. All rights, powers and remedies of ALIGN hereunder shall be in addition to and not in lieu of all other rights, powers and remedies given to ALIGN, whether at law, in equity or otherwise.

5.      ***Independent Obligations***.

(a)      ALIGN's rights hereunder shall not be exhausted by the exercise of any of its rights or remedies or by any such action or by any number of successive actions until and unless all Guaranteed Obligations have been fully paid and performed.

(b)      Guarantor agrees that ALIGN may enforce this Guaranty, at any time and from time to time, without the necessity of resorting to or exhausting any security or collateral and without the necessity of proceeding against the Guarantor or any other Person. Guarantor hereby waives the right to require ALIGN to proceed against the Guarantor or any other Person, to exercise any right or remedy under the Pharmacy Services Agreement or to pursue any other remedy or to enforce any other right.

(c)      Guarantor shall continue to be subject to this Guaranty notwithstanding: (i) any modification, waiver, agreement or stipulation between the Guarantor and ALIGN or its successors and assigns, with respect to the Pharmacy Services Agreement; (ii) any waiver of or failure to enforce any of the terms, covenants or conditions contained in the Pharmacy Services Agreement or any modification thereof; or (iii) any release of the Guarantor or any other Person from any liability with respect to the Pharmacy Services Agreement.

(d)      The Guaranteed Obligations are not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Pharmacy Services Agreement or the pursuit by ALIGN of any remedies which ALIGN either now has or may hereafter have with respect thereto under the Pharmacy Services Agreement.

6.      ***Expenses of Enforcement.*** If any litigation between the parties hereto arises out of this Guaranty or is commenced to enforce or interpret this Guaranty, to recover damages for breach of this Guaranty, to obtain declaratory relief in connection with this Guaranty, or to otherwise obtain judicial relief in connection with the transactions which are the subject of this Guaranty, the non-prevailing party shall pay the prevailing party's costs and expenses, including without limitation, reasonable attorney's fees and expenses, arising in connection with any such litigation.

7.      ***Representations and Warranties.*** Guarantor represents and warrants that:

        (a)     it is a corporation duly organized, validly existing, and in good standing under the laws of the State of _____;

        (b)     it has all requisite corporate power and authority to execute, deliver and perform this Guaranty;

        (c)     its execution, delivery, and performance of this Guaranty have been duly authorized by all necessary corporate action on its part;

        (d)     it has executed and delivered this Guaranty and this Guaranty is the legal, valid and binding obligation of Guarantor, enforceable against it in accordance with its terms subject to the effect of applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar laws relating to or affecting creditors' rights generally, and to the effect of general principles of equity (regardless of whether considered in a proceeding in equity or at law);

        (e)     neither the execution nor delivery of this Guaranty nor compliance with or fulfillment of the terms, conditions and provisions hereof, conflicts with, results in a material breach or violation of the terms, conditions or provisions of, or constitutes a material default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under (i) the certificate of incorporation or bylaws of Guarantor, (ii) any judgment, decree, order, contract, agreement, indenture, instrument, note, mortgage, lease, governmental permit or other authorization, right, restriction or obligation to which Guarantor is a party or any of its property is subject or by which Guarantor is bound or (iii) any federal, state or local law, statute, ordinance, rule or regulation applicable to Guarantor;

        (f)     it now has and will continue to have full and complete access to the Company's financial status and the Company's ability to perform the Guaranteed Obligations;

        (g)     it has reviewed and approved copies of the Pharmacy Services Agreement and is fully informed of the remedies ALIGN may pursue, with or without notice to the Guarantor or any other Person, in the event of default of any of the Guaranteed Obligations;

        (h)     it has made, and so long as any Guaranteed Obligation remains unsatisfied it shall make, its own credit analysis of the Guarantor and shall keep itself fully informed as to all aspects of the financial condition of the Guarantor and the performance of the Guaranteed Obligations;

(i)     no consent, authorization, approval, order, license, certificate or permit or act of or from or declaration or filing with, any governmental authority or any party to any contract, agreement, instrument, lease or license to which Guarantor is a party or by which Guarantor is bound, is required for the execution, delivery or compliance with the terms hereof by Guarantor, except as have been obtained as required prior to the date hereof;

(j)     there is no pending, or to the best of its knowledge, threatened, litigation against Guarantor in any court or before any commission or regulatory body, whether federal, state or local, which challenges the validity or enforceability of this Guaranty;

(k)     it is not insolvent within the meaning of applicable state laws and federal laws relating generally to bankruptcy, insolvency or reorganization or relief of debtors; and

(l)     the financial statements of Guarantor, which have been furnished to ALIGN by Guarantor, are accurate and complete in all material respects.

8.      ***Limitations of Remedies.***  Guarantor agrees that so long as ALIGN is owed any sum under the Pharmacy Services Agreement, Guarantor will not, without the prior written consent of ALIGN: (i) assert, collect or enforce any liabilities or indebtedness owing by the Guarantor to Guarantor (collectively, "**Indebtedness**"); (ii) commence, prosecute or participate in any administrative, legal or equitable action, or take any other action to collect, enforce or recover any Indebtedness; and, (iii) commence or join with any creditor in commencing any bankruptcy, insolvency or similar proceeding with respect to the Guarantor or take any other action that could cause an Event of Bankruptcy of the Company.

9.      ***Governing Law; Jurisdiction.*** This Agreement shall be governed by and construed in accordance with the Laws of the State of Oklahoma without giving effect to any choice or conflict of Law provision or rule (whether of the State of Oklahoma or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Oklahoma. Each party consents to the jurisdiction and venue of the United States District Court for the Western District of Oklahoma or the District Court of the State of Oklahoma located in Oklahoma City, Oklahoma, as applicable, for any Action arising from or in connection with the interpretation or enforcement of this Agreement.

10.     ***Modification.*** This Guaranty may not be amended or modified in any respect whatsoever except by an instrument in writing signed by Guarantor and ALIGN.

11.     ***Severability.*** Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty or the application thereof to any Person or circumstances shall, to any extent and for any reason, be held in any proceeding to be invalid, illegal or unenforceable, such provision, or the application thereof to any Person or circumstance, shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or any other provisions hereof or the application of such provision to Persons or circumstances other than those to which it was held to be invalid, illegal or unenforceable.

12.     ***Headings.*** The titles and headings contained in this Guaranty are included for

convenience only and shall not be considered part of this Guaranty in construing or interpreting any provision hereof.

13. **Successors and Assigns.** This Guaranty shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.

14. **Assignment**. No transfer or assignment by Guarantor of any of its rights hereunder (whether by operation of law or otherwise) shall relieve the Guarantor of any of its obligations hereunder.

15. **Full Knowledge**. Guarantor has full knowledge of the terms of the Pharmacy Services Agreement and the Company's obligations thereunder and in connection therewith. Guarantor fully understands all rights and remedies of ALIGN in the event of default by the Guarantor with respect to any of those obligations. Guarantor has full knowledge of the financial condition of the Guarantor and assumes the obligation to keep itself fully informed as to the Company's financial condition and its performance of its obligations under the Pharmacy Services Agreement. ALIGN shall have no obligation to disclose to Guarantor any information concerning the Company, the Pharmacy Services Agreement or any other facts material to Guarantor, regardless of whether ALIGN knows such facts are unknown to Guarantor and would materially increase the risk to Guarantor beyond that which Guarantor might have intended to assume under this Guaranty. The nature and effect of this Guaranty, including (without limitation) the effect of each of the waivers contained herein, have been fully explained to Guarantor by competent legal counsel of Guarantor's choosing.

**IN WITNESS WHEREOF**, the duly authorized officers and representatives of ALIGN and Guarantor have executed this Guaranty as of the Effective Date.

**GUARANTOR**                           **AlignRx, LLC**

By: _____            By: _____

Name: _____          Name: Melanie Maxwell

Title: _____          Title: President

Date: _____          Date: _____

**EXHIBIT A**

**Pharmacy Location(s)**

Complete the following information or attach a list of Pharmacy Locations including the information requested below.

**NCPDP:** _____  **NPI:** _____

**Pharmacy Legal Name:** _____

**Pharmacy Mailing Address:** _____

       **City, State, ZIP:** _____


**Pharmacy DBA Name:** _____

**Pharmacy Physical Address:** _____

       **City, State, ZIP:** _____


**Phone:** _____  **Fax:** _____

**Email:** _____